PHILLIPS NIZER LLP
Regina E. Faul
666 Fifth Avenue
New York, New York 10103-0084
Tel:  (212) 977-9700
Fax: (212) 262-5152
*Attorneys for Respondent Ciampa Management Corp.*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JAMES G. PAULSEN, Regional Director of  :
Region 29 of the National Labor Relations  :
Board, for and on behalf of the National Labor  :
Relations Board,  :
  :  15-cv-4000 (ARR)(VVP)
                              Petitioner,  :
  :  **Oral Argument Requested**
              v.  :
  :
CIAMPA MANAGEMENT CORP.,  :
  :
                              Respondent.  :
  :
-----------------------------------------------------------------X

**RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION
TO APPLICATION FOR PRELIMINARY INJUNCTION UNDER SECTION 10(j) OF
THE NATIONAL LABOR RELATIONS ACT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 2

FACTS ..................................................................................................................................... 6

    Ciampa Policies Are Strictly Enforced ........................................................................ 6

    Andres and Kevin Galarza's Insubordination and Ultimate Termination .......................... 7

    Jonathan Par and Luis Martin's Improper Conduct and Necessary Discipline ................. 10

    Ciampa's Policy Concerning Communication With Tenants ............................................ 11

    Union Activity at Ciampa's Building ............................................................................. 12

ARGUMENT ........................................................................................................................ 12

POINT I THE BOARD'S REASONABLE CAUSE DETERMINATION IS FATALLY
FLAWED AND SHOULD BE REJECTED BY THE COURT ................................................. 13

    A.    The Board's Investigation Is Fatally Flawed and Insufficient to Establish
           Reasonable Cause to Believe that Unfair Labor Practice Have Been
           Committed .................................................................................................... 14

    B.    A Comprehensive Investigation Would Have Revealed that Ciampa Has
           Not Violated the Act ..................................................................................... 18

POINT II Interim Injunctive Relief Is Not Just And Proper .................................................... 20

    A.    An Interim Order Issued Three-Weeks Prior To Trial Would Disregard the
           Purpose of 10(j) Interim Relief And Would Be Inequitable ............................. 20

    B.    The Union Will Not Be Adversely Impacted if an Interim Order is Not
           Issued .......................................................................................................... 21

    C.    Andres and Kevin Galarza Will Not Be Irreparably Harmed ............................. 22

    D.    The Harm to Ciampa If an Interim Order is Granted Far Outweighs Any
           Potential Benefit to the Union and Andres and Kevin Galarza, Individually ........ 22

CONCLUSION .................................................................................................................... 24

1259419.2

# TABLE OF AUTHORITIES

Page

## CASES

*Aguayo v. Tomco Carburetor Co.,*
   853 F.2d 744, 747 (9th Cir. 1988) ..................................................................... 2

*Angel v. Sacks,*
   382 F.2d 655 (10th Cir. 1967) ......................................................................... 3

*Associated Press v. NLRB,*
   301 U.S. 103, 1 LRRM 732 (1937) ................................................................. 18

*Brook v. NLRB,*
   538 F.2d 260, 92 LRRM 3420 (9th Cir. 1976) ................................................ 18

*Cannady v. NLRB,*
   466 F.2d 583, 80 LRRM 3425 (10th Cir. 1972) .............................................. 18

*Dunbar v. Colony Liquor and Wine Distributors, LLC,*
   15 F.Supp.2d 233 (S.D.N.Y. 1998) ................................................................ 12

*Hoffman v. Inn Credible Caterers, Ltd.,*
   247 F.3d 360 (2d Cir. 2001) ........................................................................... 13

*Indiana Metal Prods. v. NLRB,*
   202 F.2d 613, 31 LRRM 2490 (7th Cir. 1953) ............................................... 18

*Johansen v. Queen Mary Restaurant Corp.,*
   522 F.2d 6 (9th Cir. 1975) ............................................................................... 3

*Kaynard v. Mego Corp.,*
   633 F.2d 1026 (2d Cir. 1980) ................................................................... 13, 20

*Kaynard v. MMIC, Inc.,*
   734 F.2d 950 (2d Cir. 1984) ........................................................................... 13

*Keynard v. Mego Corp.,*
   633 F.2d 1026 (2d Cir. 1980) ......................................................................... 20

*Kreisberg v. Healthbridge Management LLC,*
   732 F.3d 131 (2d Cir. 2013) ........................................................................... 13

*McLeod v. Business Machine and Office Appliance Mechanics Conf. Board,*
   300 F.2d 237 (2d Cir. 1962) ........................................................................... 13

*NLRB v. Bangor Plastics,*
    392 F.2d 772, 67 LRRM 2987 (6th Cir. 1967) ................................................................ 18

*NLRB v. Condenser Corp.,*
    128 F.2d 67, 10 LRRM 483 (3rd Cir. 1942) ................................................................ 18

*NLRB v. Knuth Bros.,*
    537 F.2d 950, 92 LRRM 3275 (7th Cir. 1976) ................................................................ 18

*NLRB v. McGahey,*
    233 F.2d 406, 38 LRRM 2142 (5th Cir. 1956) ................................................................ 18

*NLRB v. Montgomery Ward & Co.,*
    157 F.2d 486, 19 LRRM 2008 (8th Cir. 1946) ................................................................ 18

*S.W. Noggle Co. v. NLRB,*
    478 F.2d 1144, 83 LRRM 2225 (8th Cir. 1973) ................................................................ 18

*Seeler v. The Trading Port, Inc.,*
    517 F.2d 33 (2d Cir. 1975) ................................................................ 2, 19, 20

*Silverman v. JRL Food Corp.,*
    196 F.3d 334 (2d Cir. 1999) ................................................................ 22

*Silverman v. Major League Baseball Player Relations Comm.,*
    67 F.3d 1054 (2d Cir. 1995) ................................................................ 13

*Stephenson v. NLRB,*
    614 F.2d 1210, 103 LRRM 2238 (9th Cir. 1980) ................................................................ 18

*Syncro Corp. v. NLRB,*
    597 F.2d 922, 101 LRRM 2790 (5th Cir. 1979) ................................................................ 18

## STATUTORY AUTHORITIES

29 U.S.C. § 160(j) ................................................................ 2

## ADDITIONAL AUTHORITIES

*Bayliner Marine Corp.* LRRM 1450 NLRB 12 ................................................................ 18

*Borin Packing Co.* LRRM 1062 NLRB 280 ................................................................ 18

*McCullough Environmental Services, Inc.* NLRB 345 ................................................................ 19

*NAACO Materials Handling Group, Inc.* NLRB 1245 ................................................................ 19

*Stemilt Growers, Inc.* NLRB No. 95 ................................................................ 18

*The Fresno Bee* NLRB No. 180 ........................................................................................ 18

*U.S. 989 (1982). See also, Amelio's* NLRB 182 ........................................................ 14

*Wright Line* NLRB 1083 ........................................................................................... 14

## PRELIMINARY STATEMENT

Petitioner James G. Paulsen, Regional Director of Region 29 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board (the "Board"), is not entitled to the requested relief as there does not exists reasonable cause to believe that an unfair labor practice occurred, and the requested relief is not an appropriate remedy.

This case does not present circumstances demonstrating the appropriateness of an "extraordinary remedy" for injunctive relief pursuant to Section 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(j).  Section 10(j) relief is an unusual and extreme remedy that is only appropriate when there is a clear showing that an ultimate Board order will be ineffective to remedy the alleged unfair labor practice.  It is well-settled that an "extraordinary remedy" is to be used only in the limited circumstances where "the remedial purpose of the Act would be frustrated unless immediate action [is] taken." *McLeod v. General Elect. Co.*, 366 F.2d 847, 849 (2d Cir. 1966), *vacated as moot*, 385 U.S. 533 (1967); *Kreisberg ex rel. N.L.R.B. v. HealthBridge Mgmt.*, 732 F.3d 131, 141 (2d. Cir. 2013); *Sharp v. Parents in Cmty. Action,* 172 F.2d 1034, 1038 (8th Cir. 1999). *See also,* S. Rep. No. 105, 80th Cong. 1st Sess at p. 27, I, Legislative History of the Labor Management Relations Act of 1947, at p. 433 (purpose of enacting Section 10(j) was to provide interim relief in cases were circumstances "make it impossible or not feasible to restore or preserve the status quo" by or pending the final Board Order.) .

Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. *Seeler v. The Trading Port, Inc.,* 517 F.2d 33, 37-38 (2d Cir. 1975); *Aguayo v. Tomco*

1259419.2

*Carburetor Co.,* 853 F.2d 744, 747, (9th Cir. 1988), *citing to, Angel v. Sacks*, 382 F.2d 655, 659-60 (10th Cir. 1967); *Johansen v. Queen Mary Restaurant Corp.,* 522 F.2d 6, 7 (9th Cir. 1975).

Here, the Board disingenuously argues that it now needs this order to issue for such non-existent purposes, despite that the purported unlawful labor practice occurred more than seven (7) months ago and the case is set for trial merely three (3) weeks from now. The Board's unexplained (and inexplicable) delay in bringing this application demonstrates that they have not, and will not, be harmed if a preliminary injunction is not issued. To the contrary, the Board's determination at trial does not exist here because its decision will be rendered in a matter of weeks – hardly the risk of delay that warrants injunctive relief. Not only does this application fail to support the intended purpose of 10(j) interim relief, it also fails to comply with the Board's internal directives, which requires "priority action" and "speedy remedy." See September 30, 2010 Memorandum of the Office of the General Counsel to All Regional Directors, Officers-In-Charge and Resident Officers. The Board waited more than seven (7) months to seek 10(j) interim relief. Its own actions contravene the very policies the Board is required to follow and illustrates that this "extraordinary remedy" is not necessary, much less warranted in this case.

In its application to the Court, the Board haughtily argues that the Court should defer to the Regional Director's determination regarding "reasonable cause." This does not however mean the Court must accept the findings as true. Rather, the Court may reach a different conclusion if it reasonably believes that the Board's legal or factual theories are flawed. Indeed, if Congress intended that Section 10(j) relief be granted merely upon the Board's sole discretion, it would not have required Court intervention to obtain this remedy. The Board is required to

turn to the Court for this relief and it is the Court, and not the Board, who must determine whether the extraordinary remedy is warranted.

Here, the Board's investigation was fatally flawed and incomplete - premised solely on speculative self-serving affidavits by interested parties (many of which were unsigned).  The Board failed to give any consideration to Respondent Ciampa Management Corp.'s ("Ciampa") Superintendent Jose Merchan's Affidavit, without any reason.  Further, while the Board suggests throughout its papers that Ciampa failed to produce evidence in support of its defense, it ignores the fact that many critical documents and statements were never requested by the Board during its investigation.  If the Board actually conducted a comprehensive and competent investigation it would have learned that: (1) Ciampa received several complaints from building residential tenants regarding the conduct of Kevin and Andres Galarza and Jonathan Par; (2) Building policies concerning electronic devices, uniforms and punctuality have always been strictly enforced by Ciampa; (3) Ciampa employees who have not signed the Union petition have also been disciplined and terminated for failing to comply with company policy; (4) there is surveillance footage documenting Kevin and Andres Galarza violating company policy by using their cell phones during their shifts; and (4) Union activity at Ciampa's building is ongoing to this very day without any interference by Ciampa.   Therefore, the Board's conclusion that they have reasonable cause to believe that Ciampa violated the Act should be rejected by the Court.

The Board has also failed to demonstrate that it would be "just and proper" for a preliminary injunction to be issued in this matter.  Despite the Board's representation to the contrary, the application is not seeking to return the parties to a "status quo" arrangement, but rather seeks an Order granting the ultimate relief it is seeking by way of the underlying petition and at trial.  Indeed, a review of the relief sought in the Petition and the Proposed Order for

4

preliminary injunction is completely identical. If the Court grants the Board the relief its requests, it will not result in a "status quo" arrangement, but will afford the Board the ultimate relief it is seeking at the soon upcoming trial, without the burden of establishing the merits of its claims.

Not only will Ciampa be severely prejudiced by this result, it will also be harmed if an interim order is granted. Indeed, the risk to Ciampa far outweighs any potential benefit to the Union or Kevin and Andres Galarza, individually, if an interim order is entered. While the Board claims that failing to reinstate Kevin and Andres Galarza for the next three weeks will have a significant chilling effect on the Union's activity, nothing can be further from the truth. First, Kevin and Andres Galarza were terminated more than seven (7) months ago and, since that time, the Union has remained active in the building – even holding a rally only a few weeks ago. The Board has failed to demonstrate how an interim order is critical, especially when it delayed in bringing this action for over seven (7) months. The harm imposed on Ciampa if an interim order is granted far outweighs any benefit because of the significant security risks it would create at the Building. Many tenants at Ciampa's building complained about Kevin and Andres Galarza and Jonathan Par's conduct and raised serious concerns about their safety. Ciampa should not be forced to reinstate two employees, or modify their policies, when it is evident that such requirements would impose a serious risk to the safety of the building and its residents.

A preliminary injunction awarding the Board the ultimate relief it is seeking at trial, which is scheduled to commence on August 11, 2015, is improper and inequitable. Therefore, the Board's application should be denied in its entirety.

5

## FACTS

The most pertinent facts in this case are those omitted by the Board. Such facts are omitted because the Board simply failed to conduct a comprehensive investigation into the claims made by Local 32BJ, SEIU ("Union").

Ciampa manages three rental apartment buildings (Packard Square 1, Packard Square 2 and Packard Square 3) each located in Long Island City, NY (the "Building"). See Jose Merchan Affidavit dated July 17, 2015 ("Merchan Affidavit") at ¶ 2. Each building is staffed with handymen, porters and doormen. Id. In general, the handymen perform general repairs, the porters perform general maintenance and cleaning services and the doormen perform lobby and security services. Id. All three buildings provide 24-hour lobby and security services. Id.

### Ciampa Policies Are Strictly Enforced

Upon hire, the superintendent of all the buildings, Jose Merchan ("Merchan"), meets with all doormen at the Buildings, and spends some time over a few days orienting them including reviewing the rules and policies of the Building and management, giving a tour of the Building, explaining how the Building "works," and the requirements of the position. Id. at ¶ 5. This orientation also includes training the employees as to the service that management expects doormen to provide the tenants including: opening the doors; intake of packages; assisting tenants with carrying packages; proper protocol for greeting tenants and visitors; maintaining a constant presence in the lobby area; the importance of good hygiene and appropriate behavior behind the desk (i.e.: no sleeping, no eating, no cell phones, no internet usage, etc.) Id. at ¶ 6.

These policies have always been enforced by Ciampa management. See Victor Hidalgo Affidavit dated July 17, 2015 ("Hidalgo Aff.") at ¶ 6; Merchan Aff. at ¶ 7. Indeed, while the

6

1259419.2

Board suggests that these policies were only enforced once the Union petition was presented to Ciampa, and only enforced against individuals who signed the petition, the facts reveal otherwise. Id. at ¶ 8.  If the Board interviewed other Ciampa employees, who did not sign the Union petition, they would have learned that some of these other employees have also been disciplined, and even terminated, for violating these policies[1].    Id. at ¶¶ 9-10; Raul Valle Affidavit dated July 17, 2015 ("Valle Aff.") at ¶¶ 8 and 14.  In fact, other than the few involved individuals who the Board interviewed (i.e., Kevin and Andres Galarza and Jonathan Par), Ciampa employees believe that the foregoing policies have always been strictly enforced by Ciampa management against all employees. Id. at ¶ 13.  Several employees who did not sign the Union petition have also been disciplined and terminated for failing to comply with these policies.  See Merchan Aff. at ¶¶9-10.  It is understood that doorman are the face and security of the building and, for this reason, it is necessary for them to adhere to these policies at all times. See Hidalgo Aff. at ¶ 6; Valle Aff. at ¶ 4.

### Andres and Kevin Galarza's Insubordination and Ultimate Termination

Andres and Kevin Galarza both were hired as doormen for Packard Square 3 in or around April, 2014, close to the date the building opened.  See Merchan Aff. at ¶  11.  For the first few months of their employment, Andres and Kevin Galarza diligently performed their duties. Id. at ¶ 12.  Unfortunately, beginning in or around the end of July, 2014, Merchan noticed a serious downturn in their work performance.  Id. at ¶ 13.  Merchan counseled both Andres and Kevin Galarza concerning their performance and failure to comply with building policy (such as, not wearing the proper uniforms, sitting or lounging behind the lobby desk, using their personal

---

[1] Notably, Ciampa has never asked its employees if they support the Union, and has not done so in preparation of its Opposition to the instant application.  Ciampa has relied on the representations made by the Board in its application regarding union support, as well the union petition, annexed to the Board's application, which lists pro-union employees.

phone or tablet, not properly responding to tenants and visitors). Id. at ¶ 15. Despite Merchan's efforts, Andres and Kevin Galarza continued to neglect their duties and engaged in inappropriate workplace conduct, including over the next few months, incidents of insubordination, abuse, belligerence, inattention to their duties, refusal to wear the proper uniform, sloppiness, and overall refusal to adhere to company policy. Id. at ¶ 28. Ciampa also received complaints from building tenants regarding their conduct. For example, in an email dated October 14, 2014, a tenant emailed Ciampa stating, in pertinent part, as follows:

> I wanted to bring a few things to your attention. **Multiple tenants** in this building are extremely **frustrated and concerned with the lack of attention the doormen give to ANYONE that enters the building**.
>
> **People just stroll into the building**, tenants, friends, family, deliveries, fresh direct, and random people on the street. **The door is always unlocked** and propped opened and sometimes **the people at the door don't even look up when people walk in! This is so unsettling and unsafe**, let alone the fact that we all pay a lot of money to **live in a building with a doorman to feel safe every night**."

Id. at ¶ 18,  Exhibit A (emphasis added).

Andres Galarza was warned on several occasions for violating building policies (for being improperly dressed, sitting behind the desk with his feet up, using his phone or tablet and even sleeping on the job behind the lobby desk). Id. at ¶ 16. On several occasions Andres Galarza became belligerent toward Merchan, and was disrespectful and insubordinate and used abusive, foul language when Merchan would correct his behavior. Id. at ¶ 25.

Kevin Galarza was also warned on several occasions for violating policies (failing to deliver packages to tenants, failing to properly log in deliveries, insubordination and using his phone). Id. at ¶ 17. Kevin Galarza similarly was disrespectful and insubordinate when Merchan would address him or correct any of his behavior, and spoke to Merchan in a derogatory manner about Merchan and the company. Id. at ¶ 26.

8

Video surveillance taken of Andres and Kevin Galarza in December, 2014 reveal their constant use of cell phones during their shifts in blatant disregard of Ciampa's policies and Merchan's countless directives to comply with these requirements.  Id. at ¶ 27; Exhibit B (video surveillance footage of Kevin and Andres Galarza using their cell phones during their shifts only weeks prior to their termination.)

Finally, after Merchan's attempts to verbally counsel both employees proved unsuccessful, Merchan issued written warnings to both employees, who were put on notice that future violations of company policy would result in discipline up to and including termination of their employment.  Id. at ¶ 28.  Despite being warned on at least 10 occasions, both verbally and in writing not to use their cell phones or tablets while on duty (a plain violation of policy, security and common sense as a  service employee at a residential building), neither employee corrected their conduct and Ciampa terminated their employment on January 16, 2015.  Id. at ¶ 30.  Merchan terminated Andres in person and called Kevin on his cell phone.  Id. at ¶ 31.  Merchan did not speak with Kevin on Andres' cell phone.  Id. at ¶ 31, Exhibit C (Merchan's cell phone records of January 16, 2015 noting his call to Kevin Galarza).

9

## Jonathan Par and Luis Martin's Improper Conduct and Necessary Discipline

Jonathan Par ("Par") was hired as a doorman on or about March 13, 2014 and Luis Martin ("Martin") was hired as doormen on or about July 22, 2013. Id. at ¶ 35. Beginning in or around August, 2014, Merchan noticed a serious downturn in their work performance including late arrivals to work, using a personal phone or tablet during their shifts and eating at the lobby desk. Id. at ¶ 36. Merchan spoke to Par and Martin several times and asked them to do their jobs. Id. at ¶ 37. Each were verbally counseled on many occasions.  Id.  On March 2, 2015, Ciampa sent Par a written warning noting his insubordination to company policy by failing to timely report to work on at least 7 occasions in February, 2015. Id. at ¶ 38; Exhibit H1 to the Board's application.  The written warning advised Par that if he continued to disregard company policy, he would be subject to further discipline.  Id.  Par ignored the letter and continued to engage in inappropriate workplace conduct and insubordination. Id. at ¶ 39.  On May 28, 2015, Ciampa sent Par a second written warning noting that he is continuously late for work and fails to remain at his post for his scheduled shift.   Id.; Exhibit H2 to the Board's application.   The warning advised Par that if he continued to disregard company policy, he would be subject to further discipline.  Id.

Likewise, Martin was warned on several occasions for violating building policies (for using a personal phone at the lobby desk and eating at the lobby desk during his shift). Id. at ¶ 42.  On January 23, 2015, Ciampa sent Martin a written warning concerning his inappropriate conduct.  Id. at ¶ 43.  Martin ignored this warning.  Id. at ¶ 44.  As a result, on May 22, 2015, Ciampa sent Martin a second written warning, noting his lateness and insubordination on at least 7 separate occasions.   Id. at ¶ 45; Exhibit K to the Board's application.   To date, Martin continues to engage in inappropriate conduct at work.  Id. at ¶ 46.

1259419.2

## Ciampa's Policy Concerning Communication With Tenants

On May 28, 2015, Ciampa received a written complaint from a tenant concerning Par's conduct.  Id. at ¶ 40.  Specifically, the complaint provides, in pertinent part, as follows:

I wanted to bring a few thing[s] to get your attention about the DOORMAN!

**People just [s]troll into the building, sometimes the people at the door don't even look up when people walk in.**

I was surprised the last weekend **when the doorman (JONATHAN) was knocking at my door asking about if I could sign a document to support them to get a raise.**

This is **so unsettling because I think this doesn't concern us** (Me and my Wife).  **[W]e don't want no one knocking at our door** just to break the peace.

We think **we are not the only tenants in this situation** and I hope someone else is trying to contact with the management to see what happen.

[T]hanks!! And **please try to work on it.**

Id., Exhibit C (emphasis added).

Despite the Board's conclusion that Ciampa issued a policy to respond to Union activity, Ciampa sent a memo in response to the foregoing tenant complaint and to address security concerns at the Building.  Specifically, Ciampa sent a memo to <u>all</u> employees (and not just to employees who signed the petition) stating the following:

> "The building has received tenant complaints of building staff approaching tenants concerning personal issues.  This is a reminder to staff that the building is your workplace and all staff communications with building tenants during working hours and while on building premises should be professional and work-related (e.g., building/tenant issues).  You are also reminded that building staff may access the building only during their regularly scheduled work hours or if otherwise authorized by building management."

<u>See</u> Exhibit I to the Board's application.

11

**Union Activity at Ciampa's Building**

Ciampa first learned about the Union activity in November, 2014, when Andres Galarza, Jonathan Par and Carlos Abad came to the Building and handed Merchan the petition.  Id. at ¶ 48.  Merchan did not ask any specific questions about the employee's Union activities (and never inquired about their activities at any other time.)  Id. at ¶¶ 47 and 48.  When Merchan received the Union petition in November, 2014 he simply asked what was being handed to him and read the petition after the employees left.  Id.  Prior to November 2014, Ciampa was not aware of the Union organizing efforts at the Building.  Id. at ¶ 47.  Ciampa never interrogated employees about their Union activities or withheld bonuses as a result of the same. Id.

The Board's assertion that the Union "is in real danger of losing its remaining support" is completely false.  Since Andres and Kevin Galarza's termination, more than seven (7) months ago, the Union's activity has become more visible and stronger at the Building.  Hidalgo Aff. at ¶ 20. In fact, just in the past few weeks, a rally was held outside Ciampa's buildings.  Id., Exhibit A (photographs from the rally).  Ciampa did not interfere with this organizing effort, which was considerable in size with numerous supporters.

## ARGUMENT

Injunctive relief under Section 10(j) of the Act is an "extraordinary remedy" to be used only in the limited circumstances where "the remedial purpose of the Act would be frustrated unless immediate action [is] taken." *McLeod v. General Elec. Co.,* 366 F.2d at 849.  It is well settled that traditional equitable considerations determine whether a remedy sought pursuant to Section 10(j) of the Act is appropriate.  *Dunbar v. Colony Liquor and Wine Distributors, LLC,*

12

15 F.Supp.2d 233 (S.D.N.Y. 1998) (general equitable principles apply in determining the propriety of injunctive relief under the Act.)

To be entitled to the extraordinary relief of a preliminary injunction, the Board must find that: (1) there is "reasonable cause to believe that unfair labor practices have been committed" and (2) that the requested relief is "just and proper." *See Kreisberg v. Healthbridge Management LLC*, 732 F.3d 131, 141-42 (2d Cir. 2013), *Kaynard v. MMIC, Inc.*, 734 F.2d 950 (2d Cir. 1984), *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360 (2d Cir. 2001).

## POINT I

## THE BOARD'S REASONABLE CAUSE DETERMINATION IS FATALLY FLAWED AND SHOULD BE REJECTED BY THE COURT

In determining whether "reasonable cause" exists, "[a]ppropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." *Silverman v. Major League Baseball Player Relations Comm.,* 67 F.3d 1054, 1059 (2d Cir. 1995). The Board must show that there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." *McLeod v. Business Machine and Office Appliance Mechanics Conf. Board,* 300 F.2d 237, 242 n. 17 (2d Cir. 1962). If the district court is convinced that the Board's legal position is wrong, reasonable cause it not met. *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1033 (2d Cir. 1980). It is the Court, and not the Board, who must determine whether the Board's investigation was sufficient (or fatally flawed) and whether the extraordinary remedy would be an equitable result.

To establish a violation of §§ 8(a)(1) or 8(a)(3) of the Act, the General Counsel has the burden of establishing: (1) the employee was engaged in protected concerted activity; (2) the employer was aware of that activity; (3) the protected activity of the employee was a substantial

motivating factor in the employer's decision; and (4) there was a causal connection between the employer's *animus* and its decision to take adverse employment action.  If the General Counsel makes such a showing, the burden of persuasion then shifts to the employer to show that it would have made the same decision absent the protected activity.  *Wright Line*, 251 NLRB 1083 (1980), *enforced* 662 F.2d 899 (1st Cir. 1981), *cert. denied* 455 U.S. 989 (1982).  *See also*, Amelio's, 301 NLRB 182 (1991) (to establish a §8(a)(1) violation, the Respondent must know of the protected activity, the activity must be protected, and the adverse employment action must be motivated by the employee's protected activity).

Here, the Board's mis-determination that Ciampa violated Section 8(a)(1) and (3) of the Act (upon which its application for injunctive relief is premised) was based on speculative and wholly unsupported statements by interested parties, many of which are not even properly signed affidavits[2].  The Court should not defer to the Regional Director's "Judgment" to issue an injunction based upon such a shoddy investigation and conclusion of facts and evidence.

**A.      The Board's Investigation Is Fatally Flawed and Insufficient to Establish
          Reasonable Cause to Believe that Unfair Labor Practice Have Been Committed**

The Board's "investigation" primarily consisted of obtaining statements by interested parties.  Specifically, the Board relied upon affidavits from the following: (1) Andres Galarza (pro-Union supporter terminated in January, 2015); (2) Kevin Galarza (pro-Union supporter terminated in January, 2015); (3) Jonathan Par (pro-Union supporter disciplined by Ciampa); (4) Luis Martin (pro-Union supporter disciplined by Ciampa); Michelle Crentisl (Union representative); and (5) Wilmer Rojas (pro-Union employee).  While the Board also obtained an

---

[2] The Affidavits of Andres Galarza and Kevin Galarza, perhaps the most critical affidavits for the Board's investigation, are not even signed or notarized. See Exhibit D and F to the Board's application.

affidavit from Ciampa's Superintendent, Jose Merchan, it refused to rely on any of his statements, or provide any reason for failing to do so.

These affidavits are speculative, wholly conclusory and self-serving without sufficient documentary evidence to support their assertions. For example:

- Andres Galarza asserts that "employees that didn't sign the Union list got their checks on Wednesday before thanksgiving. I know this because I asked my coworker Freyd (last name unknown) who did not sign the Union list." See Andres Galarza Affidavit at Exhibit D to the Board's application. However, the Board failed to obtain any statement from Freyd, or even confirm with Ciampa whether some of the employees were paid on the Wednesday before Thanksgiving. This fact could have easily been determined by speaking with Merchan, who confirmed that the paychecks were delivered and where not withheld. See Merchan Aff. ¶ 52. It could have also been confirmed by reviewing Ciampa's paycheck records. None of this was requested by the Board during its investigation. Instead, they simply relied on Andres Galarza's statement.

- Kevin Galarza states that "[t]he employees that didn't sign the petition received their checks on time….I asked my co-worker Jose Alvarado if he and his brother-in law Raul had received their checks on Wednesday before each holiday. Jose told me, "Yes" Raul didn't sign the petition either." See Exhibit F to the Board's application. Again, the Board failed to obtain any statement from Jose Alvarado or Raul, or review any of Ciampa's records. Instead, they were satisfied with Kevin Galarza's (unsigned) self-serving statement.

- In Luis Martin's Affidavit he claims that "in or about October 2014, Supervisor Merchan knew that employees were involved in Union activity because he would see Union Organizer Michelle Crentsil." See Exhibit J1 to the Board's application. However, Merchan testified in his affidavit that "prior to November, 2013, I was not aware of the Union organizing at the Employer's facility." See Exhibit N to the Board's Application. He also confirmed this fact in his supplemental Affidavit. See Merchan Aff. at ¶ 48. Nevertheless, the Board failed to consider Merchan's statement and relied exclusively on Martin's statement to the contrary.

- In Andres Galarza's Affidavit he states that "[s]ince Superintendent Jose told me to not be on my cell phone [on or about December 1, 2014], I stopped using it." See Andres Galarza Affidavit at Exhibit D to the Board's application. While the Board admits in their application that they were aware of surveillance cameras in the Building lobby, they failed to request copies of this footage during their investigation. If they had done so, they would have seen that, while Andres Galarza claims he stopped using his cell phone during his shifts on or about

15

December 1, 2014, he continued to use his cell phone at the lobby desk after that date and in blatant violation of Ciampa's policy. See Merchan Aff., Exhibit B.

- In Kevin Galarza's Affidavit he states that "the employees who didn't sign the petition received a bottle of whiskey and $50 for Christmas and a bonus check for New Year. I received a bottle of whisky for Christmas but not the money." See Exhibit F to the Board's application. The Board's investigation into this claim merely rested on Kevin's statements. It failed to review Ciampa's bonus records, or inquire about the "bottle of whisky." If it had done so, it would have learned that not every individual received a monetary bonus, regardless of whether they signed the Union petition or not. In fact, several non-Union supporters also did not receive a monetary bonus and some Union supporters did receive a bonus. Further, the "bottle whiskey" was not a bonus from Ciampa, but a gift provided to all employees from Citi Habitat, the rental broker at the Building. See Merchan Aff. at ¶ 51.

These individuals admit in their Affidavits that Ciampa maintained a policy prohibiting the use of cell phones during their shifts and requiring punctuality and proper uniforms. They also admit that they failed to comply with these policies. They claim that these policies were only enforced after Ciampa learned of the Union activity and were only enforced against them because of their Union participation. However, if the Board interviewed other Ciampa employees, who did not sign the petition, or asked Merchan about the enforcement of these policies, they would have learned: (1) Ciampa policies have always been strictly enforced against all employees; and (2) employees, other than those who signed the petition, have also been disciplined and terminated for failing to comply with these policies. Accordingly, the Board's flawed unreasonable conclusion that Ciampa only strictly enforced the work rules against pro-Union employee's only makes sense by ignoring (or refusing to seek out) the actual facts, which would contradicts its allegations. Clearly this reasoning is flawed.

The Board also claims that Kevin and Andres Galarza and Jonathan Par's termination/discipline has had a "chilling effect" on Union activity, but fails to submit a single sworn statement or documentary evidence confirming this conclusion. It also fails to consider, much less address, recent events, including a Union rally, with considerable support, held just a

16

1259419.2

few weeks ago.  See Hidalgo Affidavit at ¶ 20, Exhibit A (images of the rally), which negates the Board's disingenuous argument to the Court.  If the Union can organize and hold a rally with considerable support just a few weeks prior to the instant application, how can the Board reasonably claim that the Union's activity has been "chilled" by the termination/discipline of a few individuals that occurred more than seven (7) months ago.  Further, while Board relies on the sworn statements of a few interested individuals, they fail to submit a single statement (even anonymously) from any Ciampa employee to support their conclusion that Ciampa employees are unwilling to join the Union's organizing efforts in fear of retaliation by Ciampa.

The Board also incorrectly concludes that Ciampa promulgated "overly broad work rules," relying on the sworn statement of Luis Martin, who claims that the June 1, 2015 memo was sent in response to an alleged e-mail by a tenant in support of their organizing effort.  See Board's Memorandum of Law at pg. 14.  However, notably absent from the Board's submission is this purported May 31, 2015 e-mail, or even an affidavit from this tenant.  What the Board failed to consider, or even request, was the tenant complaint received by Ciampa on May 28, 2015, only 4-days prior to issuance of the memo.  Instead, the Board submits a petition, signed by a few tenants almost six (6) months prior to the June 1, 2015 memo[3].  The Board failed to speak with any of these tenants, or submit a single affidavit from even one of them to support their nonsensical conclusion, which instead was premised on a few affidavits by interested parties.

Based upon the foregoing, it is evident that the Board failed to conduct a comprehensive and competent investigation to reach its conclusion.  The Board's investigation is fatally flawed

---

[3] The petition was only signed by approximately fifty-six (56) residents out of approximately 400 tenants that reside in the Buildings.

1259419.2

and insufficient to establish reasonable cause to believe that unfair labor practice has been committed by Ciampa.

**B.      A Comprehensive Investigation Would Have Revealed that Ciampa Has Not Violated the Act**

It is well-established that an employer has an absolute right to maintain the efficient and orderly operation of its business.   Indeed, an employer may discipline an employee for insufficient cause or no cause, and there is no violation of §8(a)(3) so long as the employer's purpose is not to encourage or discourage Union membership.  *Borin Packing Co.,* 208 NLRB 280, 85 LRRM 1062 (1974); *NLRB v. McGahey*, 233 F.2d 406, 38 LRRM 2142 (5th Cir. 1956); *Indiana Metal Prods. v. NLRB*, 202 F.2d 613, 31 LRRM 2490 (7th Cir. 1953); *NLRB v. Montgomery Ward & Co.*, 157 F.2d 486, 19 LRRM 2008 (8th Cir. 1946); *NLRB v. Condenser Corp.*, 128 F.2d 67, 10 LRRM 483 (3rd Cir. 1942); *Associated Press v. NLRB*, 301 U.S. 103, 1 LRRM 732 (1937);  *Stemilt Growers, Inc.,* 336 NLRB No. 95 (2001); *McClatchy Newspapers, Inc. d/b/a The Fresno Bee*, 337 NLRB No. 180 (2002).

Further, an employer may discipline an employee for a good reason, a bad reason, or no reason at all, without running afoul of the Act.  *Clothing Workers v. NLRB (AMF, Inc.),* 564 F.2d 434, 440, 95 LRRM 2821 (D.C. Cir.1977); *accord Stephenson v. NLRB*, 614 F.2d 1210, 103 LRRM 2238 (9th Cir. 1980); *Syncro Corp. v. NLRB*, 597 F.2d 922, 101 LRRM 2790 (5th Cir. 1979); NLRB v. Knuth Bros., 537 F.2d 950, 92 LRRM 3275 (7th Cir. 1976); *Bayliner Marine Corp.*, 215 NLRB 12, 87 LRRM 1450 (1974), *petition for review dismissed sub nom. Brook v. NLRB*, 538 F.2d 260, 92 LRRM 3420 (9th Cir. 1976); *S.W. Noggle Co. v. NLRB*, 478 F.2d 1144, 83 LRRM 2225 (8th Cir. 1973); *Cannady v. NLRB*, 466 F.2d 583, 80 LRRM 3425 (10th Cir. 1972); *NLRB v. Bangor Plastics*, 392 F.2d 772, 67 LRRM 2987 (6th Cir. 1967).  Indeed, there is

18

nothing in the Act that requires an employer to tolerate substandard work performance from employees, whether or not they are engaged in protected activities. *NAACO Materials Handling Group, Inc.*, 331 NLRB 1245 (2000); *McCullough Environmental Services, Inc.*, 306 NLRB 345 (1992) ("An employer is not required to tolerate rules infractions from employees that support the Union, to any greater extent than it tolerates from employees that do not support the Union.").

Here, the facts reveal that Ciampa disciplined employees who violated its policy relating to the safety and security of the Building and its tenants.   The disciplinary action was not compelled in response to Union organizing activity, but merely to enforce necessary policies to effectively manage a residential building.

If the Board properly conducted an investigation, it would have concluded that Ciampa did not violate the Act.   Specifically: (1) Ciampa was unaware of any Union activity prior to November, 2014; (2) Ciampa's decisions to discipline/terminate Kevin and Andres Galarza, Luis Martin and Jonathan Par was not motivated by their Union participation; (3) there is no causal connection between any alleged anti-Union *animus* and Ciampa's decision to take adverse employment action against such employees; and (4) Ciampa would have taken the same action against such employees in the absence of their alleged Union support participation in protected activity.

For all the foregoing reasons, the Board's application should be denied because there is no reasonable basis to conclude that Ciampa has engaged in unlawful labor practices.

1259419.2

## POINT II

### INTERIM INJUNCTIVE RELIEF IS NOT JUST AND PROPER

10(j) relief is only "just and proper" when it is absolutely necessary to preserve or restore the status quo "as it existed before the onset of unfair labor practices," *Seeler v. Trading Port, Inc.,* 517 F.2d 33, 38 (2d Cir. 1975), or to prevent irreparable injury because the employer's alleged actions "threaten to render the Board's processes 'totally ineffective' by precluding a meaningful final remedy." *Keynard v. Mego Corp.,* 633 F.2d 1026, 1034 (2d Cir. 1980). "General equitable principles" must also be applied in deciding whether Section 10(j) relief is appropriate. *Silverman v. 40-41 Realty Assocs., Inc.,* 668 F.2d 678, 680 (2d Cir. 1982); *Keynard v. Mego Corp.,* 633 F.2d at 1033.

**A.     An Interim Order Issued Three-Weeks Prior To Trial Would Disregard the Purpose of 10(j) Interim Relief And Would Be Inequitable**

It is well-established that a preliminary injunction is an extraordinary remedy to be used only in the limited circumstances where "the remedial purpose of the Act would be frustrated unless immediate action [is] taken." *McLeod v. General Elect. Co.,* 366 F.2d at 849.  Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. *Seeler v. The Trading Port, Inc.,* 517 F.2d at 37-38.  A preliminary injunction in this case would contravene the very purpose of Section 10(j) interim relief and should therefore be denied.

The Board's assertion that injunctive relief is necessary to prevent the purported irreparable erosion of support for the Union is belied by the fact that the Board waited over seven (7) months to file the instant application and now seeks an interim order within three (3) weeks of the Board's trial. The Board's actions demonstrate that their claims of alleged irreparable

1259419.2

harm are greatly exaggerated.  If the Board truly believed that this case was such extreme importance as to require interim relief, it should have exercised its rights expeditiously (as its own internal directives require), rather than waiting mere weeks prior to trial.  This conduct clearly demonstrates that the extraordinary relief afforded by an interim order is not warranted in this case.

Further, the interim relief the Board demands is actually the ultimate relief it is seeking on the merits of these claims, which is set for trial on August 11, 2015, merely three weeks away. Even a cursory review of the Board's petition reveals that the Board's preliminary injunction Order is _identical_ to the ultimate relief it is also demands.  The interim order will not place the parties in a "status quo" arrangement, but would afford the Board the ultimate relief it is seeking without the burden of establishing the basis for its claims.  This would not be a just and proper result.

**B.**     **The Union Will Not Be Adversely Impacted if an Interim Order is Not Issued**

Andres and Kevin Galarza were terminated on January 16, 2015, more than seven (7) months ago.  Nevertheless, Union activity at the Ciampa's properties continues to this very day. It is simply ridiculous for the Board to claim that the termination of these two individuals has created a "chilling effect" on Union activity since Union activity has continued for several months after their termination.  In fact, not only has Union activity continued, but it appears to have grown stronger and more visible at the Building – evidence by a recent Union rally, with considerable support.  No such "chilling effect" or irreparable harm will occur if an interim order is not entered when these activities are ongoing.  Accordingly, the Board's application should be denied.

21

**C.      Andres and Kevin Galarza Will Not Be Irreparably Harmed**

The Board cannot establish that Kevin and Andres Galarza will be irreparably harmed if an interim injunction is not afforded because they will have an adequate remedy of law if they ultimately prevail at the administrative trial – they will be entitled to receive back pay and reinstatement.

**D.      The Harm to Ciampa If an Interim Order is Granted Far Outweighs Any Potential Benefit to the Union and Andres and Kevin Galarza, Individually**

Conversely, Ciampa will be irreparably harmed if it is required to reinstate Kevin and Andres Galarza and adhere to the other directives set forth in the interim order.  It would create a significant threat to Ciampa's business operation and the safety of its residents.  An essential function of the doorman's position is the safety, security and comfort of building tenants. Clearly, Andres and Kevin Galarza have exhibited a total disregard for the security and welfare of the building and the tenants.  It has been found that temporary reinstatement is not just and proper if it is determined that the employee has engaged in misconduct that threatens the employer's business operation.  Silverman v. JRL Food Corp., 196 F.3d 334 (2d Cir. 1999).

The continuous misconduct by these two employees interfered with Ciampa's ability to manage the buildings and created significant safety risks for its residents.  Ciampa anticipates that this same misconduct will continue if it is required to reinstate Andres and Kevin Galarza, especially since they will be protected from any disciplinary action during the pendency of Board's trial determination, regardless of their behavior.

Likewise, Ciampa's ability to effectively manage the Building and ensure the safety, security and comfort of its tenants will be seriously affected if it was ordered to remove the disciplinary warnings from Jonthan Par and Luis Martin's personnel file and require it to rescind

its policies concerning tenant communications.  If Ciampa is directed to do so, what would prevent other employees from creating additional security risks at the Building?  The Court should not tie Ciampa's hands from effectively managing the Building and ensuring the safety and security of its tenants.

The Buildings are a new residential community in a growing neighborhood.  To ensure that tenants remain at the Buildings, and to attract others, it is critical that Ciampa employees appreciate and follow necessary policies that make tenants, and their guests, feel welcome and safe.  Requiring Ciampa to reinstate employees who blatantly disregard their policies and prohibit Ciampa from enforcing their policies will have a detrimental impact on Ciampa's business operation, management and reputation.

1259419.2

## CONCLUSION

For the reasons set forth herein, and in the supporting Affidavits and exhibits annexed thereto, Ciampa respectfully request the Court deny the Board's application for a Preliminary Injunction under Section 10(j) of the Act, in its entirety.

Dated: New York, New York
      July 17, 2015

                PHILLIPS NIZER LLP

                By: _____
                    Regina E. Faul
                    666 Fifth Avenue
                    New York, New York 10103-0084
                    (212) 977-9700
                *Attorneys for Respondent Ciampa Management Corp.*

24